Abdallah W. TAMARI, Ludwig W. Tamari, Farah Tamari, co-partners d/b/a Wahbe Tamari & Sons Co., Plaintiffs-Appellees,

v.

BACHE & CO. (LEBANON) S.A.L., a Lebanese corporation, Defendant-Appellant.

No. 83–2452.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1984.

Decided March 30, 1984.

As Corrected April 9, 1984.

**1104**

Lawrence M. Gavin, Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for defendant-appellant.

Donald C. Shine, Nisen, Elliott & Meier, Chicago, Ill., for plaintiffs-appellees.

Before BAUER and FLAUM, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

The plaintiffs-appellees ("the Tamaris"), citizens of Lebanon, brought this suit under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6b and 6c, for damages resulting from alleged fraud and mismanagement of their commodity futures trading accounts. The defendant-appellant, Bache & Co. (Lebanon) S.A.L. ("Bache Lebanon"), is a Lebanese corporation wholly owned by Bache & Co., Inc., a Delaware corporation ("Bache Delaware"). The issue presented in this interlocutory appeal is whether the district court has subject matter jurisdiction under the CEA over a dispute between nonresident aliens when the trading of commodity futures contracts giving rise to the suit took place on United States exchanges but the contacts between the parties occurred in Lebanon.[1] The district court held that it had subject matter jurisdiction in ruling on Bache Lebanon's motion for judgment on the pleadings, or, in the alternative, for summary judgment. The court later denied Bache Lebanon's motion to reconsider its ruling, but certified for appeal those parts of its order dealing with its subject matter jurisdiction over the case.[2] This court granted permission to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on July 20, 1983. For the reasons stated below, we affirm the district court's denial of Bache Lebanon's motion.

---

**1.** The plaintiffs also stated a claim of common law fraud, asserting jurisdiction under 28 U.S.C. § 1350 and principles of pendent jurisdiction. Both parties appear to assume that this claim would not survive if jurisdiction is lacking under the CEA. We note that 28 U.S.C. § 1350 has been narrowly construed and would not supply a basis for federal jurisdiction over the common law claim. *See ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir.1975). Without a federal claim that could survive a motion to dismiss, the plaintiffs also could not rely upon principles of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**2.** In its original motion, Bache Lebanon had asserted that it was entitled to judgment for three reasons: (1) the district court lacked subject matter jurisdiction; (2) the claims against it were collaterally estopped by an arbitrator's decision in favor of its parent, Bache Delaware; and (3) the Tamaris had no implied right of action under the Commodity Exchange Act. The district court ruled against Bache Lebanon on all three issues. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 547 F.Supp. 309 (N.D.Ill.1982). Bache Lebanon now seeks reversal of the district court only on the ground that subject matter jurisdiction is lacking over the dispute. Although Bache Lebanon also has discussed the issues of res judicata and collateral estoppel in support of its position on subject matter jurisdiction, we find it unnecessary to consider these issues in reaching our decision on subject matter jurisdiction. Nor do we rule on whether we have jurisdiction to decide them given the district court's limited certification order. *See Nuclear Engineering Co. v. Scott*, 660 F.2d 241 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982).

I

A. Background of this Suit

When the Tamaris filed this action in December 1975, both Bache Lebanon and its parent, Bache Delaware, were named as defendants. The Tamaris alleged that Bache Lebanon solicited them to open two commodity futures trading accounts, which they did early in 1972. The Tamaris further alleged that in soliciting and trading for their accounts, Bache Lebanon, Bache Delaware, or both, violated the CEA, causing losses to the Tamaris' accounts of more than two million dollars.[3] The alleged violations include excessive trading and churning of the accounts; making false representations, false reports and false statements to the Tamaris; and deceiving the Tamaris as to the true condition of the accounts.

The district court dismissed the action against Bache Delaware on May 19, 1976,[4] because an arbitration proceeding between the Tamaris and Bache Delaware was pending at the time suit was filed. The proceeding was before the Chicago Board of Trade pursuant to an arbitration agreement between the parties. Bache Delaware sought an award of $376,366.96 against the Tamaris for the balance owed in the Tamaris' trading accounts; the Tamaris sought $2,150,000 in damages based on a counterclaim similar to the claims of this lawsuit. Bache Delaware ultimately prevailed in the arbitration proceeding,[5] and successfully defended against the Tamaris' later suit seeking to vacate the arbitration award. *See Tamari v. Bache Halsey Stuart, Inc.*, 619 F.2d 1196 (7th Cir.), *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980). The only action remaining, therefore, is that against Bache Lebanon.

B. Motion for Judgment on the Pleadings

In light of the arbitration decision, Bache Lebanon filed its motion for judgment on the pleadings or summary judgment. The undisputed facts relevant to the question of subject matter jurisdiction raised by the motion can be briefly stated. The plaintiffs are citizens of Lebanon and reside outside the United States. Bache Lebanon, a wholly-owned subsidiary and agent of Bache Delaware, is a Lebanese corporation and has its sole office in Beirut, Lebanon. In the course of trading for the Tamaris' accounts, Bache Lebanon received futures orders from the Tamaris in Lebanon and transmitted them by wire to Bache Delaware for execution on the Chicago Board of Trade and the Chicago Mercantile Exchange. Bache Delaware, a member of both exchanges, then executed the contracts. Although there were daily conversations between the Tamaris, Bache Lebanon, and Bache Delaware, all communications and meetings between Bache Lebanon and the Tamaris regarding the commodity futures contracts traded in the United States took place in Lebanon.

The district court denied Bache Lebanon's motion, holding that subject matter jurisdiction exists over a cause of action arising from trading on United States exchanges even though the parties are nonresident aliens and the contacts between them occurred in a foreign country. The court reached its decision by applying two doctrines used to analyze jurisdictional questions that arise from transnational disputes—the effects test and the conduct

---

**3.** The parties disagree on the extent of Bache Lebanon's involvement in the solicitation and management of the Tamaris' accounts and on the nature of the agency relationship between Bache Lebanon and Bache Delaware.

**4.** This court dismissed the Tamaris' appeal of the district court's order dismissing the action against Bache Delaware without prejudice to any further appeal from an appealable order in this case. *Tamari v. Bache & Co. (Lebanon)*

*S.A.L.,* No. 76–1729 (7th Cir. Sept. 23, 1976) (unreported order).

**5.** The Tamaris filed two additional lawsuits seeking to stay the arbitration on various grounds. The district court dismissed both suits, and those dismissals were affirmed by this court. *Tamari v. Bache & Co. (Lebanon) S.A.L.,* No. 76 C 21 (N.D.Ill. May 19, 1976), *aff'd,* 565 F.2d 1194 (7th Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978); *Ta-*

test.[6] Under both tests, the court concluded that jurisdiction exists over this case.

Bache Lebanon now challenges this determination. It first contends that the district court failed to consider whether Congress intended the CEA to apply to nonresident aliens when the alleged illegal acts occurred in a foreign country, and then argues that subject matter jurisdiction is lacking because Congress did not intend such application. Bache Lebanon also contends that subject matter jurisdiction does not exist under either the conduct test or the effects test.

## II

We agree with Bache Lebanon's contention that legislative intent must be considered. *See, e.g., Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1044–45 (2d Cir.1983); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Subject matter jurisdiction exists over this dispute only if the antifraud provisions of the Commodity Exchange Act were intended to apply to foreign brokers or agents of commodity exchange members whenever they facilitate futures trading on United States exchanges.[7] Looking to the

language of the statute and its legislative history, we find no indication, however, that Congress intended to prohibit fraudulent dealings connected with futures trading on domestic exchanges only if the futures transactions originate in the United States.

■ One of Congress's fundamental purposes in enacting the CEA was to ensure fair practice and honest dealings on commodity exchanges, for the protection of the market itself as well as those who could be injured by unreasonable fluctuations in commodity prices. S.Rep. No. 93–1131, 93d Cong., 2d Sess. 14, *reprinted in* 1974 U.S. Code Cong. & Admin.News 5843, 5856. *See also* 7 U.S.C. § 5. To effectuate this purpose, the Act creates a comprehensive regulatory scheme premised on control over domestic futures exchanges and the trading of futures contracts on those exchanges.[8] The specific provisions of the CEA upon which this suit is based broadly proscribe fraudulent commodity futures transactions. Under 7 U.S.C. § 6b, any member of a contract market, or its agents, is prohibited from defrauding any person in connection with the making of a futures contract on any contract market.[9] Under 7 U.S.C. § 6c, it is unlawful for any person to enter into or confirm the execution of a

*mari v. Conrad,* No. 76 C 2071 (N.D.Ill. Nov. 15, 1976), *aff'd,* 552 F.2d 778 (7th Cir.1977).

**6.** The effects test derives from section 18 of the Restatement (Second) of Foreign Relations Law of the United States (1965), and focuses on whether conduct occurring outside the United States causes foreseeable and substantial effects within the United States. *See Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.), *rev'd on other grounds,* 405 F.2d 215 (2d Cir.1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). The conduct test derives from section 17 of the Restatement and focuses on the significance of conduct within the United States to the accomplishment of illegal activities. *See Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

**7.** Jurisdiction over civil actions arising under the CEA is conferred by 28 U.S.C. §§ 1331 and

1337 rather than by any specific provision in the CEA.

**8.** Congress has authorized the regulation of commodity futures exchanges for over seventy years. In 1922, Congress enacted the Grain Futures Act, 42 Stat. 998, which prohibited any person from dealing in futures contracts off a designated contract market. It further provided that the Secretary of Agriculture could designate a board of trade as a contract market only if the board prevented its members from disseminating misleading market information and prevented price manipulation. Though the regulatory scheme has become more expansive and complex, these basic provisions are still included in the Commodity Exchange Act. *See* 7 U.S.C. §§ 6 and 7.

**9.** The Commodity Futures Trading Commission designates a board of trade as a "contract market" when it complies with and carries out certain conditions and requirements. 7 U.S.C. § 7.

meretricious commodity futures transaction.

We recognize that the Act does not expressly state that the term "agent" includes, or excludes, agents doing business in foreign countries, or that "person" includes, or excludes, nonresident aliens. *See* 7 U.S.C. § 2. Nor does the legislative history provide any guidance on whether these provisions should be applied to all agents of commodity exchange members, regardless of their location. In support of their respective positions, the parties and the Commodity Futures Trading Commission, as *amicus curiae*, have referred to congressional reports on the 1974 and 1982 amendments to the CEA, and to subsequent regulations promulgated by the Commission.[10] Bache Lebanon attaches particular significance to the Commission's decision to exclude foreign associated persons of domestic firms from registration requirements. However, we do not regard this decision as an indication of congressional intent on the jurisdictional limits of the antifraud provisions, especially when

the Commission has taken the position that the CEA confers subject matter jurisdiction over this dispute. Likewise, the other references illustrate specific legislative and administrative responses to increased international trading in commodity futures, but do not address the intended jurisdictional scope of the antifraud provisions of the Act.

■ Finding nothing in the Act or its legislative history to indicate that Congress did not intend the CEA to apply to foreign agents, but recognizing there also is no direct evidence that Congress intended such application, we believe it is appropriate to rely on the "conduct" and "effects" tests in discerning whether subject matter jurisdiction exists over this dispute.[11] Both tests were developed in cases brought under the antifraud provisions of the federal securities laws and have recently been applied in similar cases arising under the Commodity Exchange Act. *See, e.g., Psimenos, supra,* 722 F.2d at 1044–48 (CEA); *Grunenthal GmbH v. Hotz,* 712 F.2d 421 (9th Cir.1983); *SEC v. Kasser,* 548

---

**10.** *See* H.R.Rep. No. 93–975, 93d Cong., 2d Sess. 61–64 (1974) (discussing expansion of the CEA's coverages to include world commodities); 17 C.F.R. §§ 17.00 and 21.02 (1983) (requiring foreign brokers and foreign traders to comply with Commission reporting provisions and "special calls" for information on their market positions); 17 C.F.R. § 30.02 (1983) (proscribing fraud in connection with futures transactions other than on domestic contract markets); 45 Fed.Reg. 18360 (March 20, 1980) and 17 C.F.R. § 3.12 (1983) (rescinding registration requirement for foreign associated persons of domestic firms). *See also* H.R.Rep. No. 97–565, 97th Cong., 2d Sess. 68, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3871, 3917 (discussion relating to 17 C.F.R. §§ 17.00 and 21.02).

**11.** As a matter of foreign relations law, the conduct and effects principles indicate whether the United States has jurisdiction to prescribe a rule that attaches legal consequences to conduct occurring in the United States, or to conduct occurring outside the United States that causes effects within the United States. *See* Restatement (Second) of Foreign Relations Law of the United States §§ 17 and 18 (1965). Were Congress to enact a rule beyond the scope of these principles, the statute could be challenged as violating the due process clause on the ground that Congress lacked the power to prescribe the

rule. *See Blackmer v. United States,* 284 U.S. 421, 436, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1931); *Leasco, supra,* 468 F.2d at 1334.

When the question instead is whether Congress intended a statute to have extraterritorial application, the analysis of legislative intent becomes intertwined with these principles of foreign relations law. If extraterritorial application would have no impact on domestic conditions, it is presumed that Congress did not intend the statute to apply outside the territory, unless a contrary intent appears. *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). Reliance on this presumption is misplaced, however, when the conduct under scrutiny has not occurred wholly outside the United States, or when conduct outside the United States could otherwise affect domestic conditions. *Leasco, supra,* 468 F.2d at 1334; *Schoenbaum, supra,* 405 F.2d at 206. In these cases, courts have looked to the nature of the conduct or effects in the United States to determine whether extraterritorial application would be consistent with the purposes underlying the statute. *See, e.g., Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424–25 (9th Cir.1983); *SEC v. Kasser,* 548 F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries (Manitoba), Ltd. v. SEC,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Bersch, supra,* 519 F.2d at 985–93; *Schoenbaum, supra,* 405 F.2d at 206–08.

F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries (Manitoba), Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Bersch, supra,* 519 F.2d 985–93; *ITT v. Vencap, Ltd.,* 519 F.2d 1001, 1015–19 (2d Cir.1975); *Leasco, supra,* 468 F.2d at 1333–39; *Schoenbaum, supra,* 405 F.2d at 206–08; *Alemano v. ACLI International, Inc.,* 2 Comm.Fut.L.Rep. (CCH) ¶ 21,898 at 27,894 (S.D.N.Y. Nov. 2, 1983) (CEA); *Mormels v. Girofinance, S.A.,* 544 F.Supp. 815 (S.D.N.Y.1982) (CEA). The conduct test focuses on the foreigner's conduct within the United States as it relates to the alleged scheme to defraud. *See, e.g., Grunenthal, supra,* 712 F.2d at 423–26; *Kasser, supra,* 548 F.2d at 112–16; *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515, 523–28 (8th Cir.1973); *Bersch, supra,* 519 F.2d at 987. When the conduct occurring in the United States is material to the successful completion of the alleged scheme, jurisdiction is asserted based on the theory that Congress would not have intended the United States to be used as a base for effectuating the fraudulent conduct of foreign companies. *See Psimenos, supra,* 722 F.2d at 1046; *Kasser, supra,* 548 F.2d at 116. *See also Vencap, supra,* 519 F.2d at 1017. Under the effects test, courts have looked to whether conduct occurring in foreign countries had caused foreseeable and substantial harm to interests in the United States. *See, e.g., Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 416–17 (8th Cir.1979); *Vencap, supra,* 519 F.2d at 1015–17; *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1334 (2d Cir.1972); *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206–09 (2d Cir.), *rev'd on other grounds,* 405 F.2d 215 (2d Cir.1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). The underlying theory is that Congress would have wished domestic markets and domestic investors to be protected from improper foreign transactions. *See Vencap, supra,* 519 F.2d at 1016–17; *Schoenbaum, supra,* 405 F.2d at 206. *See also Kasser, supra,* 548 F.2d at 116.

■ The district court's analysis under the conduct and effects tests was derived from these analogous cases. We find that the district court correctly applied the tests to the facts of this case and adopt its analysis under both tests.[12] *See Tamari v. Bache & Co. (Lebanon) S.A.L.,* 547 F.Supp. 309 (N.D.Ill.1982). The transmission of commodity futures orders to the United States would be an essential step in the consummation of any scheme to defraud through futures trading on United States exchanges. Further, when transactions initiated by agents abroad involve trading on United States exchanges, the pricing and hedging functions of the domestic markets are directly implicated, just as they would be by an entirely domestic transaction. If transactions are the result of fraudulent representations, unauthorized trading or mismanagement of trading accounts, prices and trading volumes in the domestic marketplace will be artificially influenced, and public confidence in the markets could be undermined.

By asserting jurisdiction under the conduct and effects rationales, the purposes of the Act are advanced. Were we to construe the CEA as inapplicable to the foreign agents of commodity exchange members when they facilitate trading on domestic exchanges, the domestic commodity futures market would not be protected from the negative effects of fraudulent transactions originating abroad. Because the fundamental purpose of the Act is to ensure the integrity of the domestic commodity markets, we expect that Congress intended to proscribe fraudulent conduct associated with any commodity future transactions executed on a domestic exchange, regardless of the location of the agents that facilitate the trading.

---

12. We also note that the Second Circuit in *Psimenos, supra,* expressly approved the district court's conclusion that the transmission of a customer's orders from abroad to the United States constitutes sufficient conduct within the United States to support jurisdiction under the CEA.

We therefore affirm the district court's order and opinion finding subject matter jurisdiction over this case.