**UNITED STATES of America, Plaintiff,**

v.

**Norman K. FURLETT and Ira P. Greenspon, Defendants.**

**No. 91 CR 258.**

United States District Court,
N.D. Illinois, E.D.

Nov. 14, 1991.

Edward G. Kohler, Asst. U.S. Atty., Chicago, Ill., for U.S.

James S. Montana, Jr., Richard G. Agin, Law Offices of James S. Montana, Jr., Chicago, Ill., for defendant Norman K. Furlett.

Richard L. Manning, Burman and Manning, Chicago, Ill., for defendant Ira P. Greenspon.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

## I. INTRODUCTION

The government alleges in this criminal prosecution that defendants Norman K. Furlett and Ira P. Greenspon committed fraud in the trading of commodity futures contracts. In addition, Furlett and Greenspon are accused of obstructing the Commodity Futures Trading Commission's investigation into their conduct and suborning perjury. Furlett has moved to dismiss the indictment on the ground that it is barred by the double jeopardy provisions of the Fifth Amendment in light of prior sanctions imposed by the Commodity Futures Trading Commission for the same conduct underlying this prosecution. Greenspon has adopted Furlett's motion. For the reasons set forth below, the motion is denied.

## II. FACTS

For purposes of the pending motion to dismiss, the government's allegations need only be summarized briefly. According to the indictment, Furlett and Greenspon are "associated persons" (also known as brokers, account representatives, or account executives) affiliated with GNP Commodities, Inc. ("GNP"), an Illinois corporation whose principal place of business is in Chicago. GNP is a futures commission merchant (also known as an FCM or brokerage firm) which is a member of both the Chicago Board of Trade and the Chicago Mercantile Exchange. As an FCM, GNP solicits and accepts orders to buy or sell commodity futures contracts.

According to the indictment, Greenspon and Furlett became partners in a commodi-

ties brokerage business which was a part of GNP in December, 1985. In their role as brokers, they placed orders for the purchase and sale of commodity futures on behalf of GNP customers.

The government alleges that beginning no later than January, 1986, and continuing until at least October, 1987, Furlett and Greenspon engaged in a conspiracy to commit mail and wire fraud, to obstruct an investigation of the CFTC, and to suborn perjury. (Indictment, Count One.) The indictment also charges the defendants with the substantive offenses of mail fraud (Counts Two through Ten), obstruction of a proceeding pending before a federal agency (Count Eleven), and suborning perjury (Count Twelve).

More specifically, the government alleges that Furlett and Greenspon engaged in a pattern of deceitful commodities trading. According to the indictment, defendants on multiple occasions placed orders for the purchase or sale of a commodity without identifying the account for which the transaction was being made. The failure to identify an account number purportedly was a violation of internal GNP rules as well as CFTC and commodities exchange regulations. Allegedly, Furlett and Greenspon would then wait to see whether or not the relevant trade was profitable. If the trade turned out to be profitable, defendants allegedly would then assign it either to their own accounts or to accounts in which they held an undisclosed beneficial interest. If the trade resulted in a loss, defendants would allegedly assign it to the accounts of other customers.

In addition, the indictment alleges that Furlett and Greenspon made misrepresentations to their commodities customers or directed subordinates to do so. On certain occasions, for example, investments allegedly were solicited from GNP customers based upon representations regarding the track record of accounts to which profitable trades had been assigned. On other occasions, defendants allegedly would inform a customer falsely that defendants themselves were trading in a particular

commodity in order to persuade the customer to trade in that commodity.

On October 11, 1989, the Division of Enforcement of the CFTC filed a complaint against Furlett and Greenspon, among others, based largely upon the types of conduct alleged above. In particular, the complaint alleged that Greenspon and Furlett issued orders without account identification numbers, allocated profitable trades to accounts belonging to themselves or to their friends, and made fraudulent representations to GNP customers. A hearing was conducted before an administrative law judge ("ALJ") in November, 1989.

On May 25, 1990, the ALJ entered a lengthy opinion in which he concluded, *inter alia*, that Furlett and Greenspon had violated Sections 4b(A), 4b(C), and 4g(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6b(A), 6b(C), and 6g(1), by fraudulently allocating trades, making fraudulent misrepresentations to customers concerning commodity futures accounts, and placing trade orders without account numbers and failing to make an immediate record of such orders with the proper account information. In assessing the severity of the conduct, the ALJ observed:

> The facts set forth in this matter constitute a pernicious, widespread, and institutionalized scheme of cheating and defrauding customers, sustained without abatement or restraint over a period of years. The egregiousness of Greenspon's and Furlett's conduct is amplified by the recondite nature of their activity, and the tacit acceptance of the fraud they perpetrated by respondents Monieson [who supervised Furlett and Greenspon] and GNP. As such, it is imperative that sanctions be levied against respondents to deter further illegal activity and to protect public customers from the type of insidious conduct described in this case.

(ALJ Op. at 133–34.) The ALJ proceeded to revoke the CFTC registrations of Furlett and Greenspon, prohibit both from trading

on or subject to the rules of any contract market, and order them to cease and desist from any further violations of the Commodities Exchange Act. (*Id.* at 134–35.) In addition, "taking into consideration the extreme seriousness of the violations committed by respondent[s] ... and the representations of [their] net worth," the ALJ ordered Greenspon and Furlett each to pay a civil monetary penalty of $75,000. (*Id.*) [1] The government has represented to this Court without contradiction that the ALJ's findings and order are on appeal within the CFTC. (*See* Gov. Mem. at 7, n. 4.)

The indictment in this case was returned on April 3, 1991.

### III. ANALYSIS

■ The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. amend. V. There are three scenarios which run afoul of the double jeopardy bar: (1) a second prosecution of an individual for an offense of which he already has been acquitted; (2) a second prosecution of an individual for an offense of which he already has been convicted; and (3) the imposition of multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *United States v. Reed*, 937 F.2d 575, 576 (11th Cir.1991); *United States v. Hall*, 730 F.Supp. 646, 654 (M.D.Pa.1990). Defendants argue that the instant prosecution represents the government's attempt to impose multiple punishments upon them for the same offense. In their view, the ALJ's order prohibiting them from trading in any contract market and fining them each $75,000, although imposed in a civil proceeding, is punitive in nature, thereby precluding the government from seeking further punishment for the same conduct by way of a criminal prosecution.

Defendants' argument rests upon the Supreme Court's recent decision in *United*

---

1. By statute, the ALJ was required to consider the respondents' net worth before imposing a civil penalty. 7 U.S.C. § 9a. *See generally Gim-* *bel v. Commodity Futures Trading Commission*, 872 F.2d 196, 201 (7th Cir.1989).

*States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). The defendant in *Halper* was a medical laboratory manager who had submitted 65 false Medicare claims for reimbursement. Although numerous, the claims were for small amounts and resulted in a total loss of only $585 to the government. When his fraud was discovered, Halper was indicted for violation of the criminal false claims statute, 18 U.S.C. § 287. Upon conviction, he was sentenced to a two-year period of incarceration and fined $5,000. Subsequently, the government filed suit under the civil False Claims Act, 31 U.S.C. § 3729 *et seq.,* seeking to recover the statutory penalty of $2,000 for each of his 65 false claims (*i.e.* $130,000 in total) over and above its actual loss. The district court concluded that the Double Jeopardy Clause was implicated in light of the criminal penalties previously imposed upon Halper and the disparity between the civil statutory penalty and the relatively small loss the government had actually sustained.

The Supreme Court agreed in a unanimous opinion. Because a civil proceeding may serve punitive as well as remedial ends, the Court acknowledged that a sanction imposed in such a proceeding may constitute the sort of multiple punishment prohibited by the Double Jeopardy Clause. 109 S.Ct. at 1901–02. The proper inquiry in this regard, the Court held, was whether the sanction carried objective indicia of punishment:

> [A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can be explained only as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term. We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

109 S.Ct. at 1902 (citation omitted). The Court stressed that a civil penalty need not correspond exactly with the government's loss in order to qualify as remedial; thus, liquidated damages and other forms of "rough justice" might be imposed on top of prior criminal penalties so long as they bear a reasonable relationship to the government's injury. *Id.*

> What we announce now is a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused. The rule is one of reason: Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as "punishment" in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment.

*Id.* (footnote omitted). Consistent with this rationale, the Court remanded the case in order to afford the government an opportunity to demonstrate that the penalties it sought were in fact commensurate with the losses caused by Halper. *Id.* 109 S.Ct. at 1904.

In a concurrence, Justice Kennedy emphasized that the determination whether a civil sanction is purely remedial must be an objective one:

> Today's holding, I would stress, constitutes an objective rule that is grounded in the nature of the sanction and the facts of the particular case. It does not authorize courts to undertake a broad inquiry into the subjective purposes that may be thought to lie behind a given judicial proceeding. Such an inquiry would be amorphous and speculative, and would mire the courts in the quagmire of differentiating among the multiple purposes that underlie every proceeding, whether it be civil or criminal in name.

*Id.* 109 S.Ct. at 1904 (citations omitted).

Defendants portray this case as the mirror image of *Halper.* They contend that

the civil penalties imposed by the ALJ cannot reasonably be construed as being solely remedial in nature. In particular, they cite two aspects of the ALJ's order which in their view must be deemed punitive. The first is the ALJ's decision not simply to bar them from trading on any commodities exchange, but to preclude them from trading on "*or subject to the rules of* any contract market" (ALJ Op. at 133–34) (emphasis supplied). Defendants argue, without contradiction from the government, that this order not only bars them from acting as brokers on any exchange, but also bars them from purchasing or selling any commodity as a retail customer through other legitimate brokers. The second provision which defendants claim to be punitive is the fine imposed on each of them. This must be seen as punitive, they argue, because the ALJ spoke generally of the need to deter others in fashioning an appropriate sanction, and considered the seriousness of the offense and the defendants' respective net worths when he imposed the fine. Moreover, the ALJ did not explicitly consider the extent of any loss suffered by the government in determining the amount of

the fine. Even if he had, defendants argue, the fine imposed bore no reasonable relation to this loss. Given the purportedly punitive aspects of the sanctions the ALJ selected, defendants argue that double jeopardy has attached and that the government is now barred from bringing a criminal prosecution based upon the same underlying facts.

■ Although literal application of *Halper* might compel dismissal of most counts of the indictment in this case,[2] the Court is guided by the limited extent and purpose of the Supreme Court's holding in *Halper* in concluding that dismissal is not warranted. As set forth below, assuming that *Halper*'s double jeopardy analysis applies to a case in which civil penalties have been imposed in an administrative proceeding *before* an indictment is returned, the Court nonetheless concludes that the prior sanctions imposed upon defendants in this case reasonably may be interpreted as remedial measures only. Moreover, even if the Court were to conclude that the government were precluded from prosecuting defendants on charges which are based upon

**2.** Even if double jeopardy required dismissal of Counts One through Ten, Counts Eleven and Twelve would survive, as these two counts assert charges which were not the subject of the CFTC proceeding. These charges are based upon allegations that Furlett and Greenspon successfully endeavored to have their employee, Craig Michael Bell, commit perjury in the testimony he had initially given in the course of the CFTC's investigation. Defendants assert that these charges are barred by double jeopardy because Bell testified before the ALJ and acknowledged his perjury at that time. They also assert that the ALJ considered this perjury when he imposed sanctions upon defendants. Bell did testify before the ALJ, and he did suggest that he had previously given perjured testimony with the encouragement of Furlett and Greenspon. (*See* Exhibit B to Furlett Mem., Transcript of Proceedings before ALJ at 389–90, 392–93, 402.) However, Bell's perjury is not alleged in the complaint filed by the CFTC Division of Enforcement, let alone asserted as a separate charge in that complaint. (*See* Exhibit A to Furlett Mem., Complaint and Notice of Hearing.) Moreover, although the ALJ made repeated reference to Bell's testimony in his findings (*e.g.*, ALJ Op. at 57–59, 73–74, 91–92, 93–95, 111, 112, 120–21), he did not advert to Bell's prior perjured testimony nor did he purport to find that either Greenspon or Furlett solicited

the perjury or cite such conduct in rendering his decision regarding the sanctions to be imposed. Thus, the record is devoid of evidence indicating that the defendants were either charged with or punished for the offenses set forth in Counts Eleven and Twelve of the indictment. Nor does the record demonstrate that in order to establish an essential element of these offenses, the government must prove conduct for which the defendants have already been prosecuted. *See Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990). The conduct at issue in the CFTC proceedings was defendants' allegedly fraudulent trading activity. In contrast, Counts Eleven and Twelve allege that defendants endeavored to suborn perjury, and in order to prevail upon these counts, the government need not prove that defendants engaged in fraudulent trading activity. Evidence concerning defendants' trading practices might be relevant to these charges by way of background, but it does not constitute an element of the government's case, and the possibility of an overlap of evidence between the CFTC proceeding and this prosecution does not in and of itself impinge upon defendants' double jeopardy rights. *See id.* Accordingly, Counts Eleven and Twelve of the indictment would stand even if the Court were to conclude that prosecution on the other counts were barred by the Double Jeopardy Clause.

the same set of facts which was before the ALJ, the government would be free to prosecute defendants on the charges that they obstructed a government investigation and suborned perjury.

The notion that *Halper* applies to cases like this one must give some pause. Nowhere in its opinion did the Supreme Court address whether the analysis it articulated should apply differently or at all when the civil proceeding precedes rather than follows the criminal prosecution. The Court spoke only in terms of the reverse situation, and stressed that the rule it enunciated was one "for the rare case." 109 S.Ct. at 1902. The government argues that this is one circumstance which renders *Halper* inapposite, although it offers no reasoned basis for holding that *Halper* should only apply to civil proceedings which post-date criminal ones. Moreover, as defendants point out, a number of courts have readily applied *Halper* when the order of civil and criminal prosecutions has been reversed. *See United States v. Reed, supra,* 937 F.2d at 577 n. 3 ("[T]he sequential order of the 'civil' and 'criminal' proceedings is irrelevant to our analysis. 'Although in this case the civil penalty preceded, rather than followed the criminal indictment, the *Halper* principle that civil penalties can sometimes constitute criminal punishment for double jeopardy purposes would seem to apply whether the civil penalties come before or after the criminal indictment.' "), quoting *United States v. Mayers,* 897 F.2d 1126, 1127 (11th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990); *United States v. Bizzell,* 921 F.2d 263, 267 (10th Cir.1990) ("The civil penalties were exacted before the indictment was returned, but the distinction is not significant.") *See also United States v. Walker,* 940 F.2d 442 (9th Cir. 1991) (applying *Halper* without comment where civil penalty imposed prior to criminal indictment); *United States v. Park,* 947 F.2d 130, 134 (5th Cir.1991) (acknowledging

this is "an important question," but declining to reach it). Even so, there are grounds to wonder whether *Halper* should be applied in a rote manner here.

Foremost among these reasons is the limited nature and range of remedies available in an administrative proceeding. To a great extent, proceedings before the CFTC are designed to ensure the integrity of the commodities markets. *See Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1106 (7th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984) (noting that Commodities Exchange Act creates a comprehensive regulatory scheme in order to effectuate the act's goal of ensuring "fair practice and honest dealings on the commodity exchanges"). The remedies available to the government are commensurate with this purpose. Consequently, although an ALJ may enjoy relatively broad authority to revoke registrations, prohibit further violations, impose fines, and fashion other appropriate remedies when rules are violated (*see, e.g.,* 7 U.S.C. §§ 9, 9a), her powers do not extend so far as those an Article III judge possesses under the criminal laws. Most obviously, an ALJ cannot impose a term of incarceration. Thus, if jeopardy attaches to penalties imposed in a prior administrative proceeding, the government is faced with the prospect of foregoing the opportunity to seek not only sanctions of a similar nature in a subsequent criminal prosecution, but sanctions which are beyond the authority of any ALJ to impose.[3]

The procedural posture of the prior administrative proceeding at issue here raises additional nettlesome questions. The ALJ's ruling against Furlett and Greenspon is under review. Suppose the penalties imposed by the ALJ are vacated or modified. *See* 7 U.S.C. § 9; 17 C.F.R. § 10.104(b) (1991). If *Halper* merely required the Court to consider what types of sanctions were *available* in the administrative proceedings in order to determine

---

**3.** Where the criminal prosecution precedes the civil proceeding, civil sanctions remain available so long as they do not reach the punitive level. However, where civil sanctions have already been imposed before a criminal proceeding is initiated and those sanctions are deemed punitive, that option is lost, for the Double Jeopardy Clause prohibits the second prosecution entirely. *See United States v. Walker, supra,* 940 F.2d at 443 n. 2.

whether jeopardy attached, the prospect that the ALJ's ruling might be modified would be of no moment. Yet *Halper* requires the Court to look at what sanction was actually imposed and determine whether it was out of keeping with a remedial order. Here, defendants contend that the sweeping nature of the ALJ's ban on their trading activity and the rationale behind the fines he imposed renders the ALJ's order punitive. However, if those aspects of the ALJ's ruling were reversed on appeal, the sanctions would lose their purportedly punitive character. *Cf. United States v. Park, supra,* 947 F.2d at 135 (jeopardy did not attach to prior civil penalty where petition to mitigate penalty was pending and being held in abeyance until criminal proceeding was resolved).

Perhaps the answer to this quandary is simply to require the government to make a choice: Prosecute the criminal action first or suffer the possibility that the relief obtained in an administrative proceeding might be deemed punitive and thereby foreclose resort to the wider array of penalties available in a criminal case. Such a rule might have far-reaching ramifications, however. In effect, regulatory bodies like the CFTC would be prevented from proceeding expeditiously on administrative charges and forced to await the resolution of criminal prosecutions which arise from the same set of facts. The wheels of criminal justice often grind slowly; months or years might pass while the criminal proceedings were resolved, and witnesses and other evidence might vanish in the interim. The resulting delays would effectively hamstring regulatory agencies in their efforts to serve their roles as overseers, depriving them of their ability to work concurrently with prosecutors. In the alternative, prosecutors and regulators could race to judgment, leaving courts to determine in the aftermath where the double jeopardy chips have fallen.

At the same time, acknowledging that jeopardy can attach to administrative penalties which are rendered prior to any criminal proceedings may bring Sixth Amendment concerns into play. If the doors to a later criminal prosecution may be closed depending on the type and severity of sanctions an administrative law judge decides to impose, the government and the prospective defendant alike have a keen stake in how those sanctions are framed. Oddly enough, the traditional interests of the parties may be reversed in this setting: The government likely will not want whatever administrative sanctions are imposed to be so severe that they might bar separate criminal proceedings; on the other hand, the prospective defendant may well want the sanctions to be just harsh enough that he can invoke the Double Jeopardy Clause and escape a criminal trial and the possibility of a jail term. Courts traditionally have been reluctant to impose upon administrative investigations and other proceedings the rigorous requirements which the Constitution demands of criminal prosecutions. *See generally Securities and Exchange Commission v. Saul,* 133 F.R.D. 115, 119 (N.D.Ill.1990) (Rovner, J.); *Collins v. Commodity Futures Trading Commission,* 737 F.Supp. 1467, 1480, 1482–83, 1485 (N.D.Ill.1990) (Rovner, J.), and cases cited therein. Rules which up the constitutional ante in the administrative setting may well render this line of authority obsolete. If the outcome of an administrative charge against an individual can determine whether or not the government has the right to indict that person, for example, it becomes difficult to see why certain of the safeguards which attend criminal prosecutions should not be imposed in the administrative context.

All of this is not to say that double jeopardy cannot or should not attach to administrative sanctions which pre-date criminal charges. As noted above, those courts which have considered the question whether jeopardy can attach to a civil proceeding which precedes a criminal one have answered the question in the affirmative, and there would seem to be no legitimate reason to find that a civil sanction may constitute punishment for purposes of the Double Jeopardy Clause only when it is imposed after a criminal prosecution, and not before. Nonetheless, subjecting prior administrative sanctions to double jeopardy

scrutiny was not a scenario addressed by the Court in *Halper* and may take the reach of that opinion further than the Court intended. *But see United States v. Bizzell*, 921 F.2d at 267 (applying *Halper* without reserve when civil penalties were imposed in administrative proceeding which preceded criminal indictment).

In any case, for purposes of defendants' motion to dismiss, the Court is willing to assume that jeopardy may attach to sanctions imposed by an administrative body like the CFTC. The question to be resolved, therefore, is whether the penalties imposed against Furlett and Greenspon "cannot fairly be said solely to serve a remedial purpose." *Halper*, 109 S.Ct. at 1902; *United States v. Walker, supra*, 940 F.2d at 443.

In *United States v. One Assortment of 89 Firearms*, the Supreme Court summarized the two-part test which it employs in order to determine whether a given provision is remedial or essentially punitive:

> First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

465 U.S. 354, 362–63, 104 S.Ct. 1099, 1104–05, 79 L.Ed.2d 361 (1984) (citations omitted). *See Sequoia Books, Inc. v. Ingemunson*, 901 F.2d 630, 639–40 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). "[O]nly the clearest proof that the purpose and effect of a civil provision are punitive will suffice to override Congress' manifest preference for a civil sanction." *United States v. WRW Corp.*, 731 F.Supp. 237, 238 (E.D.Ky.1989), citing *89 Firearms*, 465 U.S. at 365, 104 S.Ct. at 1106.

The remedial nature and purpose of the Commodity Exchange Act is evident from both its legislative history and the case law. "The fundamental purpose of the Commodity Exchange Act 'is to ensure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize markets to the injury of producers and consumers and the exchanges themselves.'" Campbell, "Trading in Futures under the Commodity Exchange Act," 26 *Geo.Wash. L.Rev.* 215, 223 (1958), quoting H.R.Rep. No. 421, 74th Cong., 1st Sess., 1 (1935). *See also* 7 U.S.C. § 5; S.Rep. No. 93–1131, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News 5843, 5856. This protective purpose repeatedly has been cited by the courts which have interpreted and applied the act. *See, e.g., Commodity Futures Trading Commission v. British American Commodity Options. Corp.*, 788 F.2d 92, 94 (2d Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986); *Tamari v. Bache & Co. (Lebanon) S.A.L., supra*, 730 F.2d at 1106. Moreover, courts consistently have characterized the Commodity Exchange Act as being remedial in nature. *See, e.g., Anderson v. Stephens*, 875 F.2d 76, 79 (4th Cir.1989) (per curiam); *Commodity Futures Trading Commission v. Muller*, 570 F.2d 1296, 1300 (5th Cir.1978); *Commodity Futures Trading Commission v. Morgan, Harris & Scott, Ltd.*, 484 F.Supp. 669, 677 (S.D.N.Y.1979); *Commodity Futures Trading Commission v. Comvest Trading Corp.*, 481 F.Supp. 438, 440 (D.Mass.1979). Accordingly, one may comfortably conclude that Congress intended the enforcement of the Commodity Exchange Act through administrative proceedings to serve remedial rather than punitive ends, and that the statute as enacted is consistent with that purpose.

In accord with *89 Firearms*, the Court must next consider whether the administrative sanctions imposed upon Furlett and Greenspon were so punitive in effect as to negate the remedial purpose and nature of the Commodity Exchange Act. This inquiry, of course, merges with the question posed by *Halper:* whether the sanctions imposed necessarily must be interpreted as punitive in some degree, or instead may objectively be interpreted to serve remedial ends alone.

Neither the amounts of the fines imposed nor the factors which the ALJ considered in arriving at those amounts compel one to conclude, at an objective level, that the fines were necessarily punitive in part. The ALJ considered the seriousness of the defendants' offense, as well as their apparent net worths, in setting the fines. (ALJ Op. at 134–35.) Such factors are consistent with an attempt to force defendants to surrender the profits they had reaped from the alleged fraud. Moreover, the government contends, and defendants do not really dispute, that the fines imposed were in line with the sums of money implicated by the fraud in which the ALJ found they had engaged. (*See* Furlett Reply Mem. at 3–4.)[4] Under these circumstances, one might reasonably interpret the fines as disgorgement, a sanction which the courts have consistently recognized as remedial rather than punitive. *See, e.g., Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1221 (7th Cir.1979); *Securities and Exchange Commission v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978); *Securities and Exchange Commission v. Randolph*, 564 F.Supp. 137, 142 (N.D.Cal.1983), *rev'd on other grounds*, 736 F.2d 525 (9th Cir. 1984)[5]. Thus, although the fines imposed by the ALJ did not compensate the victims of the defendants' wrongdoing, the fines may be characterized as remedial nonetheless. *See Securities and Exchange Commission v. E & H Oil Co.*, 1980 Fed. Sec.L.Rep. ¶ 97,652, 1980 WL 1444, at *3

(W.D.La. September 26, 1980). The same is true of forfeitures, which despite their harsh effects are consistently characterized as remedial rather than punitive, and thus not subject to the double jeopardy bar. *See One Assortment of 89 Firearms, supra*, 465 U.S. at 362–66, 104 S.Ct. at 1105–07; *One Lot Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 235–37, 93 S.Ct. 489, 492–93, 34 L.Ed.2d 438 (1972) (per curiam). *See generally United States v. A Parcel of Land with a Building Located Thereon Located at 40 Moon Hill Road*, 884 F.2d 41, 43–44 (1st Cir.1989) (collecting cases in which civil penalties were upheld on ground that their magnitude did not exceed reasonable approximation of injury to government). In this case, in view of the extensive and pernicious fraud in which the ALJ found the defendants to have engaged, the monetary penalties imposed were not so "overwhelmingly disproportionate" as to become punitive and trigger double jeopardy concerns. *See Halper*, 109 S.Ct. at 1902. *Cf. United States v. Moore*, 765 F.Supp. 1251, 1256–57 (E.D.Va.1991) (where defendant had breached fiduciary duty of loyalty to his governmental employer, "[t]he government's remedy—the forfeiture of illicit gain—is fairly characterized as remedial, not a penalty, because it serves as a surrogate for actual damages that may have been incurred but are far too difficult to ascertain").[6]

---

**4.** The affidavit of FBI Special Agent John Diwick, discussed *infra* at 546–547, estimates that defendants reaped a combined net profit of $172,500 from their allegedly fraudulent trading practices and caused their customers to incur a net loss of $223,500.

**5.** Language in some cases suggests that disgorgement serves a deterrent function. *See, e.g., Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir.1988); *Commodity Futures Trading Commission v. British American Commodity Options Corp., supra*, 788 F.2d at 94. Nonetheless, these cases stress that disgorgement is a remedial rather than punitive measure. *E.g. Rowe*, 850 F.2d at 1241. Consequently, although *Halper* indicates that the deterrent aspects of a sanction may be indicative of punishment, 109 S.Ct. at 1902, the dispositive point here is that, on balance, disgorgement serves remedial rather than punitive ends. *Cf. United States v. Walker, supra*, 940 F.2d at 443–44 (not-

ing that although there was language in customs directive pursuant to which civil penalty had been imposed suggesting that customs penalties were intended in part to be punitive, proper inquiry under *Halper* is what ends the sanction serves in an individual case).

**6.** Indeed, the fact that the sanctions imposed upon Furlett and Greenspon were fixed by the ALJ based upon the circumstances as he found them to be, including the extent of the fraud he perceived defendants to have committed, may be enough to distinguish *Halper*. In other words, the amount of the fines imposed here was not an arbitrary number supplied by a statute and imposed upon "a prolific but small gauge offender." *See Halper*, 109 S.Ct. at 1902. Other courts have cited this as a reason to distinguish *Halper*. *See, e.g., United States v. Pani*, 717 F.Supp. 1013, 1019 (S.D.N.Y.1989). *See also United States v. Reed, supra*, 937 F.2d at

The amount of the fines imposed also appears proportionate to the costs which defendants' alleged conduct imposed upon the government. This is not a case like *Halper*, where the government was defrauded by the defendant. Consequently, there is an air of the arbitrary in attempting to determine, in monetary terms, what the government lost as the result of the conduct with which defendants have been charged. *See United States v. Walker, supra,* 940 F.2d at 444 (dissenting opinion). Certain courts have suggested that it is enough to examine whether the monetary sanctions imposed upon the defendant were in keeping with the expense of detecting and prosecuting the *type* of offense which the defendant has committed. Others have imposed a more exacting burden, requiring the government to show that the sanctions imposed upon a given defendant bear a reasonable relationship to the costs of building its case against that defendant.

The former view is reflected in *United States v. WRW Corp., supra,* 731 F.Supp. at 238. In that case, penalties totalling over $90,000 had been imposed upon the defendants for violations of Mine Safety and Health Act. Subsequently, the defendants were convicted on conspiracy and aiding and abetting charges based upon the same underlying facts. When the government then brought suit to collect the penalties, the defendants moved to dismiss the action on double jeopardy grounds, arguing that the penalties were punitive in nature. The district court rejected this contention, concluding that the fines imposed bore a rational relationship to reimbursement of the government. Notably, the mine safety statute pursuant to which the fines had been imposed did not identify the expenses incurred by the government as a factor to be considered in setting the fine. *Compare* 7 U.S.C. § 9a. Rather, the criteria included "the size of the [mine] operator, previous violation history, seriousness of the violations, negligence of the operator, good faith correction of the violative conditions, and the ability of the operator to continue in the mining business." 731 F.Supp. at 238, citing 30 U.S.C. § 801. Moreover, the court acknowledged that it would be difficult to pin a figure on any losses the government might have suffered as the result of the safety violations. *Id.* at 239. Even so, it noted that the government would have incurred the routine ancillary costs of detection, investigation, and prosecution. *Id.* Because the amount of the fines imposed was not "so extreme and divorced" from such costs, the court determined that the fines were not punitive and therefore the action to collect them was not barred by the Double Jeopardy Clause.

The Ninth Circuit reasoned similarly in *United States v. Walker,* 940 F.2d at 442. There the defendant had been caught entering the country in the possession of marijuana which he had neither listed on his declaration form nor presented for inspection. He was immediately assessed a $500 civil penalty pursuant to statute. Later, the government brought criminal charges against the defendant for his attempt to import marijuana. The defendant moved to dismiss these charges on the ground that the civil fine previously imposed upon him was punitive because the amount of the fine was not reasonably related to the government's loss. The district court denied the motion, taking judicial notice of the financial burdens which the government incurred in order to maintain border check points and to administer the customs system, and concluding that the civil fine was not disproportionate to such costs. On appeal, the Ninth Circuit noted that the government had not produced any specific evidence of the costs it had incurred in this particular case, but concluded that the district court's rationale was similar to that which the Supreme Court had used in forfeiture cases and was sufficient for purposes of the *Halper* analysis. *Id.,* citing *One Lot Emerald Cut Stones,* 409 U.S. at 237, 93 S.Ct. at 493. *See also United States v. Valley Steel Products Co.,* 729 F.Supp. 1356, 1359–60 (Ct.Int'l Trade 1990).

577 (where postal employee had previously been suspended in arbitration proceeding, *Halper* did not apply, because that "civil penalty" had not been awarded pursuant to a statutory fixed penalty provision but instead as the result of a binding arbitration proceeding).

In contrast to these two cases, *United States v. Hall, supra,* 730 F.Supp. 646, imposes a more specific burden of proof upon the government. In *Hall,* the defendant had been convicted of knowingly transporting negotiable instruments out of the country without making the necessary report. Following the conviction, the government filed a civil suit to collect a fine imposed by the Treasury Department equal to the amount of the negotiable instruments the defendant had transported— in this case more than $1 million. In response to Hall's contention that this sanction was punitive, the government contended broadly that the fine was legitimate compensation for the extensive but immeasurable losses resulting from the type of crime Hall had committed. However, in the face of evidence showing that the government had sustained only minimal expenses in detecting this defendant's offense, the court found the government's argument inadequate to satisfy the demands of *Halper:*

> In the present case, the Government puts forth only the most minimal effort at establishing a rational relationship between the $1,035,000 civil penalty and the goal of making the Government whole. Beyond its general assertions concerning the "heavy burden" of investigation and prosecution and the injury to the United States' trade and economic programs, which it characterizes as "impossible to measure, with precise certainty," the Government makes no attempt to quantify the actual losses it has suffered as a result of Hall's criminal misconduct. The absence of such a quantification, when coupled with the disproportionate relationship between the amount of the fine and the damages apparently caused by Hall's conduct, leads the court to conclude that this fine is not rationally related to the goal of making the Government whole.

> . . . .

In the instant case, if the court were to allow the Government to impose this fine, without at least requiring some approximation of its actual damages and costs, the court would be sanctioning the very type of "clear injustice" which *Halper* prohibits. Thus, based upon the prohibition of *Halper,* the court concludes that the civil penalty assessed by the Government in this case, in its present form, violates the double jeopardy clause by twice punishing Hall for the same conduct.

730 F.Supp. at 655. *Hall* thus imposes a particularized burden: The government must demonstrate a rational relationship between the amount of the fine and the expenses the government incurred to investigate and prosecute the individual from whom the fine is sought. *Accord United States v. Fliegler,* 756 F.Supp. 688, 696–97 (E.D.N.Y.1990).

This Court need not consider whether which of these two approaches is appropriate under *Halper,* for assuming that the more demanding burden articulated in *Hall* applies, the Court is satisfied that the government has met that burden here. The government has submitted the affidavit of FBI Special Agent John Diwick, which documents the more than ten thousand hours CFTC staff members expended from 1985 through 1991 to investigate and litigate the charges against Furlett, Greenspon, and others involved in the alleged scheme at GNP.[7] Defendants do not challenge the accuracy of Diwick's affidavit, nor do they assert that the fines imposed upon them were disproportionate to the expenses associated with the CFTC's investigation of them. Under these circumstances, the Court finds the affidavit sufficient to demonstrate that the fines imposed upon Furlett and Greenspon by the ALJ are not so overwhelmingly disproportionate to the CFTC's expenses in investigating

---

**7.** Although Diwick did not attempt to assign a monetary value to these hours, his affidavit notes that the Chicago regional office of the CFTC, which had primary responsibility for this investigation, had a budget which grew from $4.5 million in 1986 to $7.1 million in 1990.

The affidavit also points out that the CFTC not only devoted the time of its staff to the investigation, but underwrote the costs of staff travel, court reporters, and other expenses incurred in the investigation.

and litigating their behavior that the fines must be deemed punitive in some degree.

■ Defendants do argue that whatever costs the CFTC may have incurred to investigate and bring administrative charges against Furlett and Greenspon, the government itself was not a victim of their alleged fraud and thus can demonstrate no actual loss which demonstrate the remedial character of the fines for purposes of *Halper.* This objection misreads *Halper* as holding that a civil fine may be imposed in addition to criminal penalties only when the government itself has sustained a direct loss from the defendant's conduct *other than* the expense of detecting and litigating that conduct. *Halper* did not so hold, however. Indeed, the district court in *Halper* had put the government's loss for double jeopardy purposes at a figure which *included* the cost of investigation and prosecution. *See United States v. Halper,* 660 F.Supp. 531, 534 (S.D.N.Y.1987), *modified,* 664 F.Supp. 852 (S.D.N.Y.1987). Although the Supreme Court ultimately remanded for additional proceedings on the extent of the government's loss, it did not disapprove of including such costs in the calculation. *See* 109 S.Ct. at 1903–04. Moreover, in the wake of *Halper,* other courts have expressly approved of taking the costs of investigation and litigation into account when fixing the government's loss. *See e.g., Walker,* 940 F.2d at 444; *Fliegler,* 756 F.Supp. at 697; *WRW,* 731 F.Supp. at 238. Indeed, to hold otherwise would rewrite a well-established line of authority expressly approving the consideration of such costs in calculating the extent of the government's loss in order to determine whether a given sanction is remedial or punitive. *See One Lot Emerald Cut Stones,* 409 U.S. at 237, 93 S.Ct. at 493; *Helvering v. Mitchell,* 303 U.S. 391, 401, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938).

■ Defendants also argue that the fines cannot be deemed remedial vis a vis the government's loss because the proof of the government's loss (Diwick's affidavit) has been submitted long after the civil sanctions were imposed and there is no indication the ALJ ever considered such loss when he imposed the fines. However, *Halper* calls for an objective inquiry into what ends the fine reasonably may be said to serve. 109 S.Ct. at 1902. As Justice Kennedy's concurrence makes quite clear, consideration of the subjective intent which might underlie a given sanction has no place in the *Halper* analysis. 109 S.Ct. at 1904. Thus, whether or not the ALJ considered the government's loss in assessing the fines against Furlett and Greenspon— and, indeed, whatever purpose he might have had in mind in imposing the fines—is simply irrelevant under *Halper.*

Finally, the ALJ's decision to exclude defendants from trading in any contract market may also be said solely to serve remedial ends. The ALJ found that both Furlett and Greenspon had engaged in fraudulent behavior "sustained without abatement or restraint over a period of years." (ALJ Op. at 133–34.) In this context, the decision to exclude defendants from trading, even through other brokers, reasonably may be interpreted as an action necessary to ensure the integrity of contract markets and protect them from persons whose actions had, in the ALJ's view, demonstrated a lack of conscience. Given the extent of the defendants' fraud as determined by the ALJ, barring them from further trading activity reasonably might be construed as a purely remedial measure proportionate with the defendants' misdeeds. *Cf. United States v. Bizzell, supra,* 921 F.2d at 267 ("It is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipation of public funds. Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition."); *Greene v. Sullivan,* 731 F.Supp. 838, 840 (E.D.Tenn.1990) (mandatory five-year exclusion of pharmacist from participation in Medicare and other state health programs after he pled guilty to submitting falsified bill to state was consistent with remedial goals of protecting beneficiaries, maintaining integrity of program, and fostering public confidence, and thus did not constitute a second punishment barred by Double Jeopardy Clause); *Manocchio v. Sullivan,* 768

F.Supp. 814, 817 (S.D.Fla.1991) (same); *Paine v. Board of Regents of University of Texas System,* 355 F.Supp. 199, 203 (W.D.Tex.1972), *aff'd,* 474 F.2d 1397 (5th Cir.1973) (automatic suspension of university students previously convicted for possession of marijuana was not barred by double jeopardy: "The Regents' Rule mandating automatic suspension of student drug or narcotic offenders is intended to protect the university community and the educational goals of the institution from such adverse influence as the offender may wield if he is allowed to remain a student. Thus the two sanctions imposed by the state upon plaintiffs have sufficiently different underlying purposes to permit characterization of the first as 'criminal' or 'punitive' and the second as 'civil', 'remedial' or 'administrative.' ")

## IV. CONCLUSION

For all of the foregoing reasons, the Court concludes that the sanctions imposed upon defendants in the prior CFTC proceeding reasonably may be said to serve solely remedial ends. Accordingly, jeopardy did not attach to that proceeding and this prosecution is not barred by the Double Jeopardy Clause.