149 F.3d 659
 Fed. Sec. L. Rep. P 90,240
KAUTHAR SDN BHD, a Malaysian Corporation, Plaintiff-Appellant,
v.
Michael A. STERNBERG, an individual and citizen of the State
of Illinois, James A. Simon, an individual and
citizen of the State of Indiana, Carl B.
Hilliard, Jr., et al.,
Defendants-Appellees.
 No. 97-2795.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 13, 1998.
Decided July 14, 1998.
Rehearing Denied Aug. 12, 1998.
 
 Daniel J. Voelker (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Kauthar SDN BHD.
 Martin T. Fletcher, Rothberg & Logan, Fort Wayne, IN, for Michael A. Sternberg and James A. Simon.
 Leonard E. Eilbacher, Eilbacher Scott, Fort Wayne, IN, for Carl B. Hillard, Jr.
 C. Erik Chickendantz (argued), Hawk, Haynie, Gallmayer & Chickedantz, Fort Wayne, IN, for Matt C.
 Warren A. Fitch (argued), Swidler & Berlin, Washington, DC; Solomon L. Lowenstein, Jr., Fort Wayne, IN, for Friendly Islands Satellite Communications, Limited.
 Wesley N. Steury, Burt, Blee, Dixon & Sutton, Fort Wayne, IN, for Larry L. Risser.
 Before CUMMINGS, RIPPLE and ROVNER, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Kauthar SDN BHD, a Malaysian corporation, filed suit on March 10, 1995, in the United States District Court for the Northern District of Illinois, Eastern Division, against numerous defendants. It alleged federal securities law violations, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)-(d), and various state law claims. The case was transferred, over Kauthar's objection, to the United States District Court for the Northern District of Indiana, Fort Wayne Division. Kauthar then filed its First Amended Complaint (the "complaint"). The defendants subsequently moved to dismiss the complaint and for summary judgment. On April 14, 1997, the district court rendered its decision in three related orders dismissing the complaint and all of its claims on multiple grounds and also granting the defendants' motion for summary judgment. Kauthar now appeals. For the reasons stated in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts[1]
 
 3
 This case centers on a $38 million investment made by Kauthar in a company called Rimsat, Ltd. Kauthar is a Malaysian corporation with its principal place of business in Kuala Lumpur, Malaysia. Rimsat, whose principal place of business is in Fort Wayne, Indiana, was incorporated in the Caribbean island nation of Nevis for the purpose of providing satellite communications services to customers within the Pacific Rim region. These satellite communications were to be provided using satellites that Rimsat had contracted to purchase from a Russian satellite company. The satellites were to be placed in geosynchronous (or geostationary) orbit positions ("GSOs") that were leased to Rimsat by a company called Friendly Islands Satellite Communications, Ltd., doing business as "Tongasat." Tongasat is incorporated in the Pacific Rim Kingdom of Tonga.
 
 
 4
 Apparently, there is a limited number of GSOs available in the world because satellites may not be put in too close proximity to one another or else communications interference occurs. Satellites in geosynchronous orbit, by definition, stay essentially in the same spot over the earth and on the same equatorial plane. Consequently, the number of these spots in space is finite and, as with all scarce resources for which there is demand, they are valuable. The International Telecommunications Union ("ITU") and the International Frequency Registration Board, agencies of the United Nations, coordinate the registration and regulation of GSO positions. Only sovereign nations may apply to the ITU for rights to a GSO position for operation of a satellite. In this case, the Kingdom of Tonga obtained seven GSOs which it leased out to others through its company Tongasat. Rimsat's apparent plan was to make its fortune by buying relatively inexpensive Russian communications satellites, leasing GSOs from Tongasat and selling satellite communications services.
 
 
 5
 Not surprisingly, such a venture is highly capital-intensive. Rimsat and various of the individual defendants involved in forming Rimsat and Tongasat sought investors for this project. Kauthar allegedly was convinced, on the basis of various communications and meetings, that Rimsat was a worthy investment, and it sank $38 million into the venture through a purchase of Rimsat stock. Kauthar effected this purchase by wiring funds to Rimsat's bank in Fort Wayne, Indiana.
 
 
 6
 In January 1995, several of Rimsat's creditors forced Rimsat into bankruptcy by filing a petition for involuntary bankruptcy in the United States Bankruptcy Court for the Northern District of Indiana. Six weeks later, when Kauthar realized that its equity stake in Rimsat was worthless, it brought this suit. Essentially, Kauthar alleged in its complaint that all of the parties involved in soliciting its investment in Rimsat intentionally misled Kauthar about the investment. Kauthar specifically points to a document that it terms a "prospectus" that was disseminated by Rimsat to outline the company's investment and business plans. In its 113-page amended complaint, Kauthar identifies alleged misrepresentations contained in the prospectus in addition to other misrepresentations and omissions it alleges were made in the course of dealings.
 
 B. Holding of the District Court
 
 7
 Rendering its decision in three related orders, the district court determined that Kauthar's complaint failed to state any tenable federal claim.
 
 
 8
 In its first two orders, the district court addressed, and dismissed, the federal causes of action. In its first order, the court addressed Kauthar's alleged federal securities fraud claims. The court held that: (1) it lacked subject matter jurisdiction to adjudicate Kauthar's federal securities claims, (2) certain of the securities claims were barred by the one-year statute of limitations, and (3) the securities claims were not pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.
 
 
 9
 In its second order, the district court revisited certain of the securities claims alleged in the complaint. The court held that Kauthar's claim brought under § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, failed because there is no private right of action recognized in this circuit under that section. The court dismissed the claims under § 12(2) of the 1933 Act, 15 U.S.C. § 77l, because that section does not apply to private sales of stock and Kauthar had failed to allege sufficient facts to indicate that the transaction involved was not a private placement. The court also held that, to the extent the complaint could be construed to allege control person liability for certain of the defendants, see 15 U.S.C. § 78t(a), those claims failed because Kauthar failed to allege essential components of the claims and because the claims were not alleged with sufficient particularity.
 
 
 10
 The other set of claims addressed in the court's second order was Kauthar's allegations concerning civil RICO violations. The court dismissed all of the RICO claims on the grounds that Kauthar failed to allege satisfactorily the requisite predicate acts, failed to allege a pattern of racketeering activity and failed to allege other essential elements of individual RICO claims under 18 U.S.C. § 1962(a)-(d).
 
 
 11
 In its third order, the court granted the defendants' motion for summary judgment on the ground that Kauthar lacked standing to sue in this case because the actual purchaser of the securities was a Mr. Tajudin Bin Ramli--not Kauthar. Following the issuance of these orders, Kauthar requested a Rule 54(b) certification in order to bring this appeal.[2] The certification was provided by the district court; this appeal followed.
 
 II
 DISCUSSION
 
 12
 We first shall address the issues with respect to the federal securities fraud claims and then shall turn to the civil RICO claims.
 
 A. Securities Fraud Claims
 
 13
 Kauthar alleged in Counts I and II of its complaint violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which relate to fraud in the purchase or sale of a security.[3] In Counts III and IV of its complaint, Kauthar alleged additional securities fraud claims predicated on violations of § 17(a) of the 1933 Act, 15 U.S.C. § 77q, and of § 12(2) of the 1933 Act, 15 U.S.C. § 77l. Before we address the specifics of each claim, we first consider a problem common to all of them.[4]
 
 
 14
 1. Extraterritorial Application of the Antifraud Securities Statutes
 
 
 15
 The district court determined that the securities violations alleged by Kauthar in Counts I-IV of its complaint were beyond the ambit of statutory protection because they involved transnational securities transactions without a sufficient connection to the United States. Specifically, the district court held that Kauthar's allegations satisfied neither the "effects" nor the "conduct" analyses employed by federal courts to decide whether the securities acts cover a particular transnational securities transaction. We review this question of law de novo.
 
 
 16
 Courts have struggled for many years to define with meaningful precision the extent to which the antifraud provisions of the securities laws apply to securities transactions that are predominantly extraterritorial in nature but have some connection to the United States. The courts that have addressed the issue have noted that the question is a difficult one because Congress has given little meaningful guidance on the issue.[5] In addition, resort to the legislative history of the securities acts does little to illuminate Congress' intent in this area. See, e.g., Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 30 (D.C.Cir.1987) ("If the text of the 1934 Act is relatively barren, even more so is the legislative history. Fifty years ago, Congress did not consider how far American courts should have jurisdiction to decide cases involving predominantly foreign securities transactions with some link to the United States. The web of international connections in the securities market was then not nearly as extensive or complex as it has become."). In fact, some courts have admitted candidly that, in fashioning an approach to the issue of extraterritorial application of the securities laws, policy considerations and the courts' best judgment have been utilized to determine the reach of the federal securities laws.[6]
 
 
 17
 In dealing with this difficult area we begin, as we always do in matters of statutory interpretation, with the words of the statute. Although the statutory language gives us little guidance, it does give us some clue of the direction we must take. Congress did leave some indication in the language of the securities laws about their intended application to foreign commerce. Section 10(b) prohibits fraud by the "use of any means or instrumentality of interstate commerce or of the mails" in "connection with the purchase or sale of any security." 15 U.S.C. § 78j & (b). "Interstate commerce" is defined to include "trade, commerce, transportation, or communication ... between any foreign country and any State." 15 U.S.C. § 78c(a)(17). A single passage in the statute addresses foreign transactions explicitly. As the District of Columbia Circuit noted in Zoelsch, 824 F.2d at 30, § 30(b) states that the 1934 Act "shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter." 15 U.S.C. § 78dd(b). The Supreme Court has said that "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). But, as some courts have noted,[7] this statutory language suggests that the antifraud provisions were intended to apply to some transnational securities transactions.
 
 
 18
 Although the circuits that have confronted the matter seem to agree that there are some transnational situations to which the antifraud provisions of the securities laws are applicable, agreement appears to end at that point. Identification of those circumstances that warrant such regulation has produced a disparity in approach, to some degree doctrinal and to some degree attitudinal, as the courts have striven to implement, in Judge Friendly's words, "what Congress would have wished if these problems had occurred to it." Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).
 
 
 19
 These efforts have produced two basic approaches to determining whether the transaction in question ought to be subject to American securities fraud regulation. These two approaches (we think that "test" is too inflexible a term to characterize the present state of the case law) focus on whether the activity in question has had a sufficient impact on or relation to the United States, its markets or its citizens to justify American regulation of the situation. Specifically, one approach focuses on the domestic conduct in question, and the other focuses on the domestic effects resulting from the transaction at issue.[8]
 
 
 20
 When focusing on the effects, the courts seek to determine whether actions " 'occurring in foreign countries ha[ve] caused foreseeable and substantial harm to interests in the United States.' " Mak v. Wocom Commodities Ltd., 112 F.3d 287, 289 (7th Cir.1997) (quoting Tamari v. Bache & Co. (Lebanon) S.A.L., 730 F.2d 1103, 1108 (7th Cir.), cert. denied, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984)). Several cases have examined the type and severity of the harm that must be suffered domestically in order to enable an exercise of jurisdiction.[9] This case, however, affords us no occasion to explore this approach; the record does not reveal sufficient effect on domestic interests to justify its invocation here.
 
 
 21
 In contrast with the effects analysis, which examines actions occurring outside of the United States, the conduct analysis focuses on actions occurring in this country as they "relate[ ] to the alleged scheme to defraud." Tamari, 730 F.2d at 1107. The chronic difficulty with such a methodology has been describing, in sufficiently precise terms, the sort of conduct occurring in the United States that ought to be adequate to trigger American regulation of the transaction. Indeed, the circuits that have confronted the matter have articulated a number of methodologies.
 
 
 22
 The predominant difference among the circuits, it appears, is the degree to which the American-based conduct must be related causally to the fraud and the resultant harm to justify the application of American securities law. At one end of the spectrum, the District of Columbia Circuit appears to require that the domestic conduct at issue must itself constitute a securities violation. See Zoelsch, 824 F.2d at 31 ("[J]urisdiction will lie in American courts where the domestic conduct comprises all the elements of a defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b-5.").[10] At the other end of the spectrum, the Third, Eighth and Ninth Circuits, although also focusing on whether the United States-based conduct caused the plaintiffs' loss, to use the Fifth Circuit's words, "generally require some lesser quantum of conduct." Robinson v. TCI/US West Communications, Inc., 117 F.3d 900, 906 (5th Cir.1997). In SEC v. Kasser, 548 F.2d 109, 114 (3d Cir.), cert. denied, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), the Third Circuit stated that the conduct came within the scope of the statute if "at least some activity designed to further a fraudulent scheme occurs within this country." The Eighth Circuit, in Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 421 (8th Cir.1979), held that the antifraud provisions were applicable when the domestic conduct "was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment." The Ninth Circuit adopted the Continental Grain approach in Grunenthal GmbH v. Hotz, 712 F.2d 421, 425 (9th Cir.1983).
 
 
 23
 Our colleagues in the Second and Fifth Circuits have set a course between the two extremes that we have just discussed. That approach requires a higher quantum of domestic conduct than do the Third, Eighth and Ninth Circuits. See Robinson v. TCI/US West Communications Inc., 117 F.3d 900, 905-06 (5th Cir.1997). The Second Circuit has stated that foreign plaintiffs' suits[11] under the antifraud provisions of the securities laws, such as Kauthar's, will be "heard only when substantial acts in furtherance of the fraud were committed within the United States." Psimenos v. E.F. Hutton & Co., Inc., 722 F.2d 1041, 1045 (2d Cir.1983).[12] Furthermore, if the United States-based activities were merely preparatory in nature, or if the " 'bulk of the activity was performed in foreign countries,' " jurisdiction will not exist. Id. at 1046 (quoting IIT v. Vencap, Ltd., 519 F.2d 1001, 1018 (2d Cir.1975)). In addition, only "where conduct 'within the United States directly caused' the loss will a district court have jurisdiction over suits by foreigners who have lost money through sales abroad." Id. (quoting Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975)); see also Vencap, 519 F.2d at 1018.
 
 
 24
 Although this court has not had occasion to articulate an approach to the extraterritorial application of the securities laws, we have employed these concepts with respect to analogous actions brought under the Commodity Exchange Act. See Mak, 112 F.3d at 288-89; Tamari, 730 F.2d at 1107 & n. 11. In that context, we have stated that "[w]hen the conduct occurring in the United States is material to the successful completion of the alleged scheme, jurisdiction is asserted based on the theory that Congress would not have intended the United States to be used as a base for effectuating the fraudulent conduct of foreign companies." Tamari, 730 F.2d at 1108. We think that our approach under the Commodities Act ought to be followed with respect to the securities laws and, although stated more generally, that it represents the same midground as that identified by the Second and Fifth Circuits. In our view, the absence of all but the most rudimentary Congressional guidance counsels that federal courts should be cautious in determining that transnational securities matters are within the ambit of our antifraud statutes. Nevertheless, we would do serious violence to the policies of these statutes if we did not recognize our Country's manifest interest in ensuring that the United States is not used as a "base of operations" from which to "defraud foreign securities purchasers or sellers." Kasser, 548 F.2d at 116. This interest is amplified by the fact that we live in an increasingly global financial community. The Second and Fifth Circuit's iterations of the test embody a satisfactory balance of these competing considerations. This analytical pattern will enable the courts to address situations in which the United States is being used as a launching pad for fraudulent international securities schemes. At the same time, it will cause us to refrain from adjudicating disputes which have little in the way of a significant connection to the United States.
 
 
 25
 We believe, therefore, that federal courts have jurisdiction over an alleged violation of the antifraud provisions of the securities laws when the conduct occurring in the United States directly causes the plaintiff's alleged loss in that the conduct forms a substantial part of the alleged fraud and is material to its success. This conduct must be more than merely preparatory in nature; however, we do not go so far as to require that the conduct occurring domestically must itself satisfy the elements of a securities violation.
 
 
 26
 We turn now to an application of these principles to Kauthar's allegations. Kauthar argues that a host of alleged general activities undertaken by various of the defendants constitutes conduct that was part of the scheme to defraud Kauthar and to solicit Kauthar's investment in Rimsat. Kauthar alleges that various documents containing fraudulent misrepresentations and omissions were prepared in the United States and were sent to it by wire and by the United States mail in an effort to obtain Kauthar's investment. Kauthar also alleges that phone calls were made from Fort Wayne, Indiana, and from San Diego, California, for the same purpose. Kauthar further alleges that the defendants had meetings and phone conversations in the United States to discuss the deceptive information contained in the prospectus and to "ultimately agree upon a plan to obtain equity funding from Kauthar by means of false and deceptive statements of fact." R.111 para. 60. Thus, according to the complaint, the United States was utilized as a base of operations from which to launch the defendants' fraudulent scheme to defraud Kauthar. Moreover, Kauthar also alleges a set of specific acts that, in combination with those already mentioned, satisfy the conduct analysis. Specifically, Kauthar alleges that it wired the payment for the Rimsat securities, over $38 million, in six installments to Rimsat's bank account in Fort Wayne, Indiana. Therefore, Kauthar has alleged that the defendants conceived and planned a scheme to defraud Kauthar in the United States, that they prepared materials in support of the scheme to solicit the payment in the United States and sent those materials from the United States via the United States mail, and that they received in the United States the fraudulently solicited payment for the securities--the final step in the alleged fraud. We think these allegations sufficient to bring the alleged conduct within the ambit of the securities laws. We are therefore constrained to disagree respectfully with the district court's contrary conclusion.
 
 2. Waiver
 
 27
 Because we have determined that the court did have jurisdiction to consider the securities violations claims alleged in Counts I-IV of Kauthar's complaint (to the extent that the conduct analysis is satisfied), we must determine whether those claims survive the alternative holdings upon which the district court also based its decision to dismiss the action. Several of the securities claims have been waived on appeal because Kauthar failed to challenge various of the district court's holdings with respect to those claims. We consistently have held that a party's failure to address a claim in its opening brief results in a waiver of that issue. See Sere v. Board of Trustees of the Univ. of Ill., 852 F.2d 285, 287 (7th Cir.1988) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.... We consistently and evenhandedly have applied the waiver doctrine when appellants have failed to raise an issue in their opening brief." (internal quotations and citations omitted)). Moreover, in situations in which there is one or more alternative holdings on an issue, we have stated that failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue. See Williams v. Leach, 938 F.2d 769, 772 (7th Cir.1991) (holding that Williams' failure to raise on appeal the alternative ground for dismissal of claim based on statute of limitations resulted in waiver of issue on appeal); Landstrom v. Illinois Dep't of Children & Family Servs., 892 F.2d 670, 678 (7th Cir.1990) (stating that because the plaintiffs failed to challenge expressly the district court's alternative holding with respect to Count II of the complaint, they had "waived any claim of error in that ruling").
 
 
 28
 Although Kauthar argues that it did not waive these issues on appeal because it incorporated by reference arguments on these issues made to the district court, we have made it clear that this practice is unacceptable and that it cannot serve as a valid presentation of an argument on appeal. See Prudential Ins. Co. of Am. v. Sipula, 776 F.2d 157, 161 n. 1 (7th Cir.1985) (expressing in "the strongest terms our disapproval of th[e] practice" of incorporating by reference briefs submitted to the district court because it unnecessarily diffuses the issues on appeal and constitutes an attempt to avoid page limitations for appellate briefs; warning that future occurrences may be sanctionable). In addition, to the extent to which Kauthar tries to cure the waiver by raising new arguments in its reply brief, this practice is also inappropriate. See Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 597 (7th Cir.1997) (stating that arguments made for the first time in a reply brief are waived), cert. denied, --- U.S. ----, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998). In light of these waiver principles, we turn to the specific claims on appeal.
 
 
 29
 In Count III of the complaint, Kauthar alleged that various of the defendants committed securities fraud in violation of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q. However, in setting forth this claim in the complaint, Kauthar acknowledged that this court has held that no private right of action exists under § 17(a), see Schlifke v. Seafirst Corp., 866 F.2d 935, 942-43 (7th Cir.1989), and expressly anticipated that the claim would be dismissed by the district court, and it was. Nevertheless, on appeal, this court's holding in Schlifke has not been addressed and the dismissal of Count III has not been directly challenged or argued. The only reference to the § 17(a) claims of Count III in Kauthar's brief is in a footnote that states, "Kauthar refers this Court to its underlying Memorandum ... for a detailed discussion of these well-pleaded claims." Appellant's Br. at 25 n.17. As we have just explained, this is not an adequate presentation of an issue to this court on appeal; accordingly, the issue of whether the district court erred in dismissing Count III is waived.
 
 
 30
 A similar result obtains with respect to the allegations of securities fraud contained in Count IV. In that count, Kauthar alleged violations of § 12(2) of the 1933 Act, 15 U.S.C. § 77l; the district court dismissed the claims for failure to state a claim upon which relief could be granted. Noting that the Supreme Court held in Gustafson v. Alloyd Co., 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), that § 12(2) applies only to public offerings of securities and not to private placements, the district court examined the allegations to ascertain whether Kauthar had alleged sufficiently that it had purchased the securities pursuant to a public offering. The district court was not persuaded that Kauthar had purchased the Rimsat stock pursuant to a public offering because, among other reasons, the document that Kauthar termed a "prospectus" expressly stated that the material it contained was confidential and proprietary. The court determined that this language is inconsistent with an offering to the public and further found inadequate Kauthar's allegations on information and belief that the document was disseminated to members of the public. Once again, despite the district court's clear articulation of its basis for dismissing the § 12(2) claims, Kauthar did not challenge this ground of decision anywhere in its brief. As with the securities fraud violations alleged in Count III, Kauthar's only attempt to address this basis of decision is to refer this court in a footnote to a memorandum submitted to the district court which purportedly contains its position on the § 12(2) claims. Accordingly, the claims with respect to § 12(2) are also waived.
 
 
 31
 Finally, to the extent that Kauthar alleged control person liability in its complaint, any argument with respect to those claims also has been waived. The district court found that Counts I and IV could be construed to assert claims for control person liability under § 20 of the 1934 Act, 15 U.S.C. § 78t(a). The court reasoned that because this type of liability is derivative, a control person can be held accountable only if there is an underlying violation of the securities laws. The court found that Kauthar had not alleged any primary violation of the securities laws by Rimsat; correspondingly, it held that there could be no derivative control person liability because there was no allegation of a primary violation. Nowhere in its brief does Kauthar challenge the court's holding with respect to control person liability. Consequently, those claims are also waived.
 
 3. Statute of Limitations
 
 32
 Despite Kauthar's waiver of various of its claims, it did challenge all of the grounds of decision to dismiss its allegations of securities fraud violations predicated on § 10(b) and Rule 10b-5 contained in Counts I and II. In addition to holding that the described transnational transaction was not within the ambit of the statute, see supra section A1, the district court dismissed the alleged violations of § 10(b) and Rule 10b-5 in Counts I and II because they were not timely filed and because they failed to state claims for fraud with the minimum level of particularity required under Rule 9(b) of the Federal Rules of Civil Procedure.[13]
 
 
 33
 We turn first to the district court's decision to dismiss the § 10(b) and Rule 10b-5 securities claims for failure to comply with the statute of limitations. We review de novo the district court's decision to dismiss, taking Kauthar's factual allegations as true and drawing all reasonable inferences in Kauthar's favor. See Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 608 (7th Cir.1995). We have noted that, because the question of whether a plaintiff had sufficient facts to place it on inquiry notice of a claim for securities fraud is one of fact, it may be "inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 367 (7th Cir.1997). However, we have also stated that, if a "plaintiff pleads facts that show its suit [is] barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis." Whirlpool, 67 F.3d at 608.[14]
 
 
 34
 Claims under § 10(b) of the 1934 Act must be brought within one year of the discovery of the violation. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Discovery occurs when a potential plaintiff has inquiry or actual notice of a violation. See Tregenza v. Great Am. Communications Co., 12 F.3d 717 (7th Cir.1993), cert. denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Inquiry notice is "the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." LaSalle v. Medco Research, Inc., 54 F.3d 443, 446 (7th Cir.1995). However, more than "merely suspicious circumstances" must exist; instead, the plaintiff must learn of a circumstance that places him "in possession of, or with ready access to, the essential facts that he needs in order to be able to sue." Fujisawa Pharm. Co., Ltd. v. Kapoor, 115 F.3d 1332, 1337 (7th Cir.1997).
 
 
 35
 The district court determined that, although Kauthar did not file the suit until March 1995, Kauthar alleged facts in its complaint indicating that it was aware in September 1993 of facts that placed it on inquiry notice. Kauthar alleged in its complaint that some of the significant fraudulent omissions regarding its investment in Rimsat concerned a fee paid by Rimsat to Chesden, Ltd. Chesden is allegedly a Hong Kong corporation controlled by various of the defendants. Kauthar claims that it relied in part on the representation contained in the "prospectus" that of the "$25,000,000 equity, the first $8,750,000 ... will go nearly exclusively for the construction of satellites and the lease of the orbital positions." R.111 p 91(k). However, instead of this use of the funds, $3.8 million allegedly was paid to Chesden as an undisclosed "finder's fee." Id. In Kauthar's own words, the nondisclosure of this payment "was material because Kauthar was entitled to know that 10% of its $38,095,238 investment ... was not going into securing, or funding amounts due under, the Tongasat Agreement ... or for other legitimate business purposes; but rather, was being diverted away from Rimsat." R.111 p 100(a).
 
 
 36
 Kauthar acknowledges in its complaint that it "learned of the allegation of the payment by Rimsat of the so-called Chesden finder's-fee in approximately September 1993." R.111, Count IV, p 119. However, Kauthar states that Hilliard, a defendant, wrote to Kauthar stating that "he had never received any monies from the so-called Chesden finder's-fee." Id. Kauthar maintains that the district court erred in holding that its alleged awareness of the existence of this previously nondisclosed $3.8 million payment was sufficient to put Kauthar on alert that it might be a victim of fraud. In support of this argument, Kauthar asserts in its brief that "the payment of the Chesden [c]ommission is simply irrelevant," apparently on the theory that its claims "are based upon numerous misrepresentations and omissions, the most critical of which related to" other aspects of the investment with Rimsat such as the "Rimsat/ Tongasat contract ... the status of the geostationary slots ... [and] the Prospectus." Appellant's Br. at 19.
 
 
 37
 Although it is true that Kauthar has alleged a plethora of fraudulent misrepresentations and omissions regarding a number of different aspects of its course of business dealings with the defendants, Kauthar's allegation that Rimsat diverted 10% of its $38 million investment to an undisclosed Hong Kong corporation certainly is not "irrelevant." Kauthar alleged that the initial $8.75 million of its investment was to be used for explicit business purposes; Kauthar also alleged that $3.8 million of that money instead was diverted to Chesden and that it was aware of the possibility of this diversion in September 1993. We believe that the district court was on solid ground in concluding that this situation should have been sufficient to prompt an investigation into the matter. As part of the agreement of the investment in Rimsat, Kauthar was represented on the Board of Directors. Indeed, Kauthar had the "power to appoint one-half of the directors to the Rimsat Board." R.111 para. 103. Consequently, it had ready access to the financial information of the company and could have verified the existence of the Chesden fee.[15] We do not think Kauthar's obligation to inquire was satisfied even if one of the defendants told Kauthar that he had not received any of those diverted funds. In these circumstances, we agree with the district court that Kauthar has pleaded that it was aware of sufficient facts to enable it to learn that it had a cause of action for fraud against the defendants more than one year before it filed suit. Accordingly, the court correctly concluded that the § 10(b) and the Rule 10b-5 violations alleged in Counts I and II of the complaint are time barred.[16]
 
 B. RICO Claims
 
 38
 Kauthar alleged, in addition to its securities fraud claims and various state law violations, civil RICO claims predicated on 18 U.S.C. § 1962(a)-(d) in Counts IX-XIV of the complaint.[17] The district court dismissed all of the claims on several alternative grounds. First, the court held that the claims were deficient because they failed to plead sufficient predicate acts--a vital component of any RICO claim. Second, the court determined that Kauthar had not alleged sufficiently a pattern of racketeering activity. Finally, the court held that each individual RICO claim failed for various claim-specific reasons. As mentioned previously, we review de novo the district court's decision to dismiss for failure to state a claim.
 
 
 39
 However, before reaching the merits of any of those holdings, we note that Kauthar encounters statutory standing difficulties with respect to its RICO claims similar to those that plagued its securities claims. In particular, there are significant questions pertaining to the extraterritorial scope of RICO. The Second Circuit recently observed that the "tests for asserting jurisdiction extraterritorially vary depending on the substantive law to be applied abroad." North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1052 (2d Cir.1996). The court in Al-Turki reviewed the conduct and effects analyses that have been developed in the areas of securities and antitrust law and determined that it was "not at all clear ... that the conduct test, as it has developed in foreign securities fraud cases, governs in cases involving the extraterritorial application of RICO." Id. The court ultimately concluded that "specifying the test for the extraterritorial application of RICO is delicate work. That work has not been done, but we need not do it now." Id. Taking note of the issue, we too decide that this question more appropriately awaits another day when we are required to determine the appropriate approach for the extraterritorial application of RICO. Because this is a statutory standing question, we need not resolve it definitively before addressing merits questions. See Steel Co. v. Citizens for a Better Env't, --- U.S. ----, ---- & n. 2, 118 S.Ct. 1003, 1013 & n. 2, 140 L.Ed.2d 210 (1998).
 
 
 40
 Turning to the merits of the claims, we confront another situation in which Kauthar has failed to challenge certain grounds of the district court's decision with respect to its RICO claims. Although Kauthar challenged the district court's conclusions that it had failed to allege sufficient predicate acts and a pattern of racketeering, Kauthar neglected to challenge the specific findings the court made with respect to each count of the complaint.[18] Accordingly, those claims are waived.
 
 
 41
 In Count IX of the complaint, Kauthar alleged that the defendants committed civil RICO violations, in contravention of 18 U.S.C. § 1962(a). Section 1962(a) prohibits any person who receives income from a pattern of racketeering activity from using that income to acquire any interest in, or to establish or to operate any enterprise engaged in, interstate or foreign commerce. The district court determined that Kauthar failed to allege crucial elements of a § 1962(a) claim, including a failure to allege that the defendants received income from the alleged racketeering activities and that the allegations failed to demonstrate that any such funds had been invested in an enterprise (Rimsat).
 
 
 42
 Similarly, in Count X, Kauthar alleged violations of 18 U.S.C. § 1962(b), which prohibits acquiring or maintaining directly or indirectly, through a pattern of racketeering activity, any interest in an enterprise engaged in interstate or foreign commerce. The court found that this claim failed because Kauthar did not allege any facts showing that the defendants acquired or maintained an interest in Rimsat through a pattern of racketeering activity. Moreover, the court determined that Kauthar had not alleged that it had suffered any injury as a result of the alleged violations of § 1962(a) or (b).
 
 
 43
 In Count XI of the complaint, Kauthar alleged violations of 18 U.S.C. § 1962(c). That RICO section prohibits any person employed by or associated with an enterprise engaged in interstate or foreign commerce from conducting or participating in the conduct of the enterprise's affairs through a pattern of racketeering activity. The court found that because the complaint failed to establish that the defendants participated in the operation or management of Rimsat, those claims were untenable.
 
 
 44
 Finally, in Counts XII-XIV, Kauthar alleged that the defendants conspired to violate 18 U.S.C. § 1962(a)-(c), respectively, in violation of 18 U.S.C. § 1962(d). Again, the court found that the complaint's allegations were deficient because the elements of a RICO conspiracy including the requisite agreement were not sufficiently set forth.
 
 
 45
 Kauthar chose not to address any of these claimspecific grounds for dismissal in its brief. Accordingly, we cannot consider them now. We recognize that the district court's multiple orders and multiple grounds of decision resulted in a challenging task for Kauthar to cover all grounds on appeal. This situation does not excuse it from addressing all of the grounds of decision. We note that no attempt to seek permission to file an oversized brief was made by Kauthar.
 
 Conclusion
 
 46
 For these reasons, the judgment of the district court is affirmed.
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 This case comes to us on appeal from the dismissal of the complaint. Consequently, we take the facts as alleged in the complaint as true for purposes of our review. See Doherty v. City of Chicago, 75 F.3d 318, 320 (7th Cir.1996)
 
 
 [2]
 Still pending in the district court at the time appeal was taken were various cross-claims filed by Matt C. Nilson and Carl B. Hilliard against the plaintiff and certain individual defendants. The district court entered a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure
 
 
 [3]
 In addition to the § 10(b) violations, Kauthar's Counts I and II reference violations of § 20(a) of the 1934 Act. Specifically, Kauthar's complaint alleges in Counts I and II "Federal Securities Fraud in Violation of Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) & 78(s)." This is puzzling as § 78(s) deals with "Registration, responsibilities, and oversight of self-regulatory organizations," none of which is at issue here. We think that Kauthar means to allege control person liability under § 20(a) of the 1934 Act, as codified at 15 U.S.C. § 78t(a). To the extent that the complaint so alleges, Kauthar's claims for control person liability were dismissed by the district court and we address that decision below
 
 
 [4]
 Although there are substantial statutory standing questions raised in this appeal, we are satisfied that Kauthar's allegations meet the minimal Article III requirements of a case or controversy--concrete injury in fact, which is fairly traceable to the actions of the defendants and which is likely to be redressed by a favorable decision of the court. See Steel Co. v. Citizens for a Better Env't, --- U.S. ----, ---- - ----, 118 S.Ct. 1003, 1016-17, 140 L.Ed.2d 210 (1998) ("This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." (footnote omitted)). Kauthar's allegations, taken as true in this context, state (1) that the company was injured in that it lost its $38 million investment in Rimsat, (2) that this injury was caused by virtue of Kauthar's reliance on the fraudulent misrepresentations and omissions of the defendants, and (3) that the district court could have awarded damages that would serve to redress that injury. Because Kauthar has alleged the minimum requirements for Article III standing, this case does not run afoul of the concerns raised in the Supreme Court's recent decision in Steel Company. In that case, the Court held that a court may not pass over an Article III standing question in order to reach instead a "more readily resolved" merits question. Id. at ----, 118 S.Ct. at 1012. Because we are satisfied here that the constitutional minimum of standing is met, we have jurisdiction to address the remaining standing and merits issues. See also McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir.1998) (finding that because Article III standing was present it could bypass a prudential standing question to reach the merits of the case)
 
 
 [5]
 See, e.g., Robinson v. TCI/US West Communications, Inc., 117 F.3d 900, 904-05 (5th Cir.1997) ("[W]ith one small exception the Exchange Act does nothing to address the circumstances under which American courts have subject matter jurisdiction to hear suits involving foreign transactions."); Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 121 (2d Cir.1995) ("It is well recognized that the Securities Exchange Act is silent as to its extraterritorial application."), cert. denied, 516 U.S. 1044, 116 S.Ct. 702, 703, 133 L.Ed.2d 659 (1996); Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 30 (D.C.Cir.1987) (stating that provisions of 1934 Act furnish "no specific indications of when American federal courts have jurisdiction over securities law claims arising from extraterritorial transactions"). But see SEC v. Kasser, 548 F.2d 109, 114 (3d Cir.) ("[T]he anti-fraud laws suggest that such [extraterritorial] application is proper. The securities acts expressly apply to 'foreign commerce,' thereby evincing a Congressional intent for a broad jurisdictional scope for the 1933 and 1934 Acts." (citing the preambles to the Acts)), cert. denied, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977)
 
 
 [6]
 See Robinson, 117 F.3d at 905 (describing the court's task of determining jurisdiction as " 'fill[ing] the void' created by a combination of congressional silence and the growth of international commerce since the Exchange Act was passed"); Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 416 (8th Cir.1979) (recognizing that its decision "in favor of finding subject matter jurisdiction is largely based upon policy considerations"); Kasser, 548 F.2d at 116 (stating that "it should be recognized that this case in a large measure calls for a policy decision"); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir.) ("The Congress that passed these extraordinary pieces of legislation in the midst of the depression could hardly have been expected to foresee the development of offshore funds thirty years later.... Our conclusions rest on ... our best judgment as to what Congress would have wished if these problems had occurred to it."), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975)
 
 
 [7]
 See Continental Grain, 592 F.2d at 416 & n. 9; Kasser, 548 F.2d at 114 & n. 21
 
 
 [8]
 The general approach of the courts has been to assume that the securities laws are applicable if either approach so indicates. See Robinson, 117 F.3d at 905; Zoelsch, 824 F.2d at 30; Tamari v. Bache & Co. (Lebanon) S.A.L., 547 F.Supp. 309, 311 (N.D.Ill.1982). We note, however, that the Second Circuit, from which these analytical approaches of conduct and effects originated, has recently stated that they need not "be applied separately and distinctly from each other" and that, in fact, "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." Itoba Ltd., 54 F.3d at 122. Since the aim of this inquiry is to measure the degree of United States involvement in the transaction in question, the joint assessment of conduct and effects seems appropriate because it permits a more comprehensive assessment of the overall transactional situation
 
 
 [9]
 See generally George K. Chamberlin, Annotation, Subject Matter Jurisdiction of Securities Fraud Action Based on Foreign Transactions, under Securities Exchange Act of 1934, 56 A.L.R. Fed. 288 (1982)
 
 
 [10]
 Indeed, in Zoelsch, the court expressed doubt "that an American court should ever assert jurisdiction over domestic conduct that causes loss to foreign investors." 824 F.2d at 32. In adopting this restrictive approach, the District of Columbia Circuit claimed to adopt expressly the Second Circuit's methodology. See id. at 33. We share the reservations of the Fifth Circuit as to whether the District of Columbia Circuit accurately portrayed the Second Circuit's jurisprudence. See Robinson, 117 F.3d at 905 n. 10. Rather, we believe that the Fifth Circuit more accurately mirrored the Second Circuit's approach, which it articulated as: "Where (as here) the alleged fraud is in connection with a sale of securities to a foreigner outside the United States, the federal securities laws apply only if acts or culpable failures to act within the United States directly caused the plaintiff's loss." Robinson, 117 F.3d at 905
 
 
 [11]
 The Second Circuit had distinguished the conduct analysis' requirements with respect to the residence and citizenship of the security purchasers in its earlier decision in Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 993 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975)
 
 
 [12]
 In Psimenos, a case brought under the Commodity Exchange Act, the Greek plaintiff alleged fraud in the defendant's managers' handling of his commodities transactions. Although the court noted that "most of the fraudulent misrepresentations alleged in the complaint occurred outside the United States," it found the conduct analysis was satisfied because a pamphlet emanating from the defendant's New York office indicated that the managers would be supervised and because the alleged fraud was completed "by trading domestic futures contracts on American commodities exchanges." 722 F.2d at 1044, 1046. Other cases have indicated that effecting transactions on exchanges in America is sufficient conduct in the United States to satisfy the conduct test. See, e.g., Tamari, 730 F.2d at 1108 (adopting district court's analysis that wiring of orders for commodity transactions to the United States and execution of those orders on Chicago exchanges was sufficient conduct to satisfy the conduct test)
 
 
 [13]
 The court also granted summary judgment in favor of the defendants on these claims on the ground that Kauthar lacked standing to sue under § 10(b) and Rule 10b-5 because it was not the actual purchaser of the securities. The purchaser standing rule derives from the Supreme Court's decision in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730-31, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). However, the rule has not been followed absolutely; courts have allowed various parties that are not actually "purchasers" to assert claims under certain circumstances. See Soderberg v. Gens, 652 F.Supp. 560, 563 (N.D.Ill.1987) (although stating rule that the federal cause of action "does not attach automatically to the security itself and pass to the next purchaser," the court notes cases in which non-purchasers were permitted to assert claims, such as shareholders' derivative claims brought on behalf of the corporation-purchaser). Consequently, the purchaser standing question appears to us to be a statutory standing issue directly analogous to the "zone of interests" doctrine, one of the "set of prudential principles that bear on the question of standing." Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (internal quotation omitted). Because this standing question is prudential in nature, we may "elide the jurisdictional issue" in order to reach the merits of the district court's grounds for dismissing the securities claims. See McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir.1998) (noting that the Supreme Court in Steel Company v. Citizens for a Better Environment, --- U.S. ----, ---- & n. 2, 118 S.Ct. 1003, 1013 & n. 2, 140 L.Ed.2d 210 (1998), authorized courts to reach merits questions prior to prudential standing issues)
 
 
 [14]
 Accord Tregenza v. Great Am. Communications Co., 12 F.3d 717, 718 (7th Cir.1993) (stating that if a party "pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court"), cert. denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); see also LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir.1998) ("Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred."); Estate of Blue v. County of Los Angeles, 120 F.3d 982, 984 (9th Cir.1997) (holding that it was not error to decide the statute of limitations question on a motion to dismiss because the pleadings contained sufficient facts to decide the matter), cert. denied, --- U.S. ----, 118 S.Ct. 1042, 140 L.Ed.2d 107 (1998); LRL Properties v. Portage Metro Housing Auth., 55 F.3d 1097, 1107 n. 6 (6th Cir.1995) noting that when " 'the face of the complaint affirmatively indicates that the time limit for bringing the claim has passed, that plaintiff may [not] escape the statute by saying nothing.' " (quoting Hoover v. Langston Equip. Assocs., 958 F.2d 742, 745 (6th Cir.1992)); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 1 (3d Cir.1994) ("While the language of Fed. R. Civ. P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."); Sanders v. Department of Army, 981 F.2d 990, 991 (8th Cir.1992) (same)
 
 
 [15]
 Although Kauthar's simple awareness of the existence of the Chesden commission may be enough for inquiry notice, the availability of this avenue for ready access to Rimsat's financial information satisfies the concern addressed in Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir.1997), that inquiry notice "does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."
 
 
 [16]
 Because we affirm the district court's decision with respect to these counts on statute of limitations grounds, it is unnecessary for us to discuss whether the plaintiff's complaint complies with the specificity requirements of Rule 9 of the Federal Rules of Civil Procedure
 
 
 [17]
 Specifically, Kauthar alleged violations of § 1962(a)-(c) in Counts IX, X, and XI, respectively. In Counts XII-XIV, Kauthar alleged that various defendants conspired to violate § 1962(a)-(c), respectively, in violation of § 1962(d)
 
 
 [18]
 Kauthar, in its reply brief, attempts to explain away this problem on the ground that it was focusing in its opening brief on the "core of the District Court's ruling" and that the "remaining portion of the District Court's Order merely adopted Defendants' arguments in support of their motion to dismiss the RICO claims." Reply Br. at 13. Moreover, Kauthar appears to rely on the assertion that "the sufficiency of the Complaint was well-briefed below" for the proposition that its need to address all of the bases for the district court's decision is somehow vitiated. Id. Kauthar also attempts to cure its waiver problem by challenging in its reply brief the grounds of decision that it failed to address previously. This method of proceeding is flatly contrary to our case law